Filed 7/7/14  P. v. Wiley CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070931 |
| Plaintiff and Respondent, | (Super. Ct. No. 11F06432) |
| v. | |
| MARK BARON WILEY, | |
| Defendant and Appellant. | |

Defendant Mark Baron Wiley appeals from a judgment of conviction following a jury trial.  The jury found defendant guilty of counts one and three, corporal injury on a cohabitant (Pen. Code, § 273.5),[1] and found true an allegation that defendant inflicted great bodily injury under circumstances involving domestic violence as to count three (§ 12022.7, subd. (e)).  The jury found defendant not guilty on count two, assault with a deadly weapon.  (§ 245, subd. (a)(1).)  Defendant admitted a prior serious felony

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of defendant's crimes.

1

allegation and a prior strike conviction allegation. Defendant was sentenced to prison for an aggregate term of 15 years.

On appeal, defendant contends that the trial court prejudicially erred in failing to instruct the jury on the lesser included offense of misdemeanor cohabitant battery (§ 243, subd. (e)) on count one. The People contend that the evidence did not support a sua sponte instruction on the lesser included offense. Additionally, the People contend that any error in the court's failure to give such an instruction was harmless because it was not reasonably probable that defendant would have obtained a more favorable result.

We agree with defendant that an instruction on the lesser included offense of cohabitant battery as to count one was supported by the evidence, and the trial court prejudicially erred in failing to give the instruction. Accordingly, we reverse the judgment in part.

## FACTUAL AND PROCEDURAL BACKGROUND

### The Charges

The three crimes with which defendant was charged occurred during two separate incidents on September 18, 2011, and involved Andrea S., a person with whom defendant cohabited. The prosecution contended that counts one and two occurred during the first incident and count three occurred during a second incident, later that same day.

The information alleged the following:

Count one--section 273.5, subdivision (a), corporal injury on a spouse.[2]

Count two--section 245, subdivision (a)(1), assault with a deadly weapon, to wit, a wooden coat rack, and by means of force likely to produce great bodily injury.[3]

---

[2] The victim and defendant were not married. The jury was instructed on the relationship of cohabitant instead of spouse and the verdict forms reflected corporal injury on a cohabitant.

2

Count three--section 273.5, corporal injury on a spouse.

In counts one and three, it was alleged that defendant personally caused great bodily injury under circumstances involving domestic violence within the meaning of section 12022.7, subdivision (e), and in count two, it was alleged that defendant caused great bodily injury within the meaning of section 12022.7, subdivision (a).

It was also alleged that defendant had two prior serious felony convictions. (§§ 667, subd. (a), 667, subds. (b)-(i) & § 1170.12.)

**The Prosecution's Evidence**

**The Victim's Testimony and the Medical Evidence**

Andrea testified that defendant moved in with her in January 2011, after the two had been together for less than a month. Even though they were not married, Andrea referred to defendant as her husband. Andrea said that their relationship was good initially, but around July 4, 2011, defendant became possessive and aggressive with her. Defendant began monitoring Andrea's calls and isolating her from her friends. Andrea would have to watch what she said to defendant because he was "hot-tempered." She conceded their relationship was volatile and they would sometimes hit each other. Nevertheless, Andrea stayed with defendant and testified that she still loved him.

On September 18, 2011, around 10:00 a.m., Andrea and defendant set up a garage sale in front of their house. Andrea sat outside to mind the sale while defendant was watching a football game inside the house, and defendant occasionally came outside. Both were drinking beer. Around 1:00 p.m., defendant and Andrea began arguing about her disrespecting him by carrying on conversations with men who stopped at the yard sale. Andrea testified the argument was "basically about who to talk to and who not to talk to . . . . He dictated who I can talk to and who I should not talk to. [¶] . . . [¶] . . . If I

---

[3] At trial, the prosecution limited its theory to assault with a deadly weapon. The jury was not instructed on assault by means of force likely to produce great bodily injury.

3

said something back to him, I'm getting smart or I'm disrespecting him or it was always something."

By 2:00 p.m., Andrea had consumed about three beers and defendant had consumed six or seven. Andrea testified that at that point, the arguments became physical. Defendant came outside and told Andrea that she "would need to stop disrespecting him." Andrea stood up from the chair in which she was sitting near the front door, and defendant grabbed her by her arms and pulled her in the house. On direct examination, Andrea said defendant did not hit her while they were outside of the house. However, on cross examination, Andrea remembered that defendant hit her "right outside in front of everyone," which was consistent with her prior statements. As she tried to pull away from defendant, she fell through the doorway into the house, tripping over a step at the doorway. When Andrea stood up, defendant hit her in the chest with a closed fist, and on the right temple of her head. Andrea then hit defendant in the neck with a closed fist. Then defendant hit her across her face, causing her to fall to her knees. Andrea testified that she then attempted to stand up, and defendant picked up a 20-pound wooden coat rack and hit her at least three times in the forehead with the hook end of the rack. "Blood flew out" of her head after the first blow with the coat rack. She testified she initially "played dead" so defendant would stop hitting her, and then she told him, "[g]o ahead and kill me." Andrea saw blood coming from her head and lost consciousness. She thought she was unconscious for approximately 20 minutes, but she was not sure exactly how much time had passed.

When Andrea regained consciousness, she saw blood "everywhere" on the floor near her head, the couch, the coat rack, her clothes, and the bottom of defendant's red and white jersey. While going to the kitchen to get a beer, she passed by a mirror and saw that her face and mouth were bloody and she felt like a few of her teeth were loose, but she did not think she was seriously injured. She saw defendant in the garage, cleaning up and putting his shirt in the washing machine. After she finished drinking a beer, she went

to the linen closet to get towels for a shower, and then went to the bathroom, all of which took several minutes. She cleaned up the blood that was dripping from her as she walked from the kitchen to the bathroom. She did not call the police because she "come[s] from a family where [they] don't call the police." However, as she was walking to the bathroom, she heard a knock at the door. While Andrea was in the bathroom, defendant came into the house and said, "[b]aby, the police are at the door."

Andrea got out of the shower and wrapped towels around her body and around her head to cover the laceration, which was still bleeding. Defendant called to Andrea that the police wanted to see her to make sure she was all right. Andrea poked her upper body around the corner in the hallway near the bathroom and told the deputies that she and defendant just had a verbal altercation and that she was okay. She testified that the deputies were only there for around two minutes. After they left, Andrea got dressed, used electrical tape to bandage her head laceration, put on a wig, and returned to the garage sale.

Andrea testified that at some point after she regained consciousness but before the sheriff's deputies came into the house, defendant cleaned up the rest of the blood. She testified "[t]hat's why that mop and broom is there," in reference to a crime scene photograph of the kitchen and dining room area showing a mop and broom, which was taken by sheriff's personnel later that night. But she also had testified that when she regained consciousness and got up, she noticed "a lot of blood" on the ground where she had been lying. She did not testify that any blood other than that which she said was dripping from her as she walked around was cleaned up prior to going into the bathroom, and she testified that she was going to the bathroom when she heard the sheriff's deputies knocking at the front door. She was unable to account for when the blood that was "everywhere" had been cleaned up. She said, "I must be missing some time slot." When pressed on cross-examination, Andrea testified that the police knocked on the door one to two minutes and she saw defendant cleaning up while the police were knocking on the

5

door.  Then she amended this statement, saying she did not see him do anything; she only heard the sound of squirt bottles and defendant cleaning while she was in the bathroom.

At some point after the sheriff's deputies left, defendant left in his car but returned about a half hour later, and he and Andrea both continued drinking.  When they ran out of alcohol, around 5:00 or 5:30 p.m., they decided to go to the liquor store and left the house in defendant's car.  Instead of the liquor store, defendant drove Andrea out to "the boondocks" of Elk Grove, in a more industrial area where there were not many people around.  When Andrea asked where they were going and defendant did not respond, she became frightened.

Andrea testified that defendant then stopped the car in a rural area and began hitting her.[4]  He hit her hard in the chest with a closed fist, and she hit him back the same way.  Defendant came to Andrea's side of the car, straddled her with his knees on her chest so she could not move her arms, and hit her face with both hands multiple times.  She struggled to get free, biting defendant on the inside of his legs and scratching him.  After defendant hit her at least 10 times, Andrea was able to get free by biting defendant's hand, and she maneuvered to the backseat of the car.  At that point, she was bleeding profusely and there was blood all over the inside of the car.  Once Andrea got into the backseat, defendant went back to the driver's seat and told her to get out of the car.  Andrea refused, and defendant drove home with her in the backseat.

Defendant dropped Andrea off at the house and drove away quickly.  Andrea testified that on her way to get ice in the kitchen, she fainted.  When she woke, she crawled to the front door to try to get help and fainted a second time near the door.  A neighbor, Ann P., came to Andrea's aid.  Ann P. called 911 to get medical attention for

---

[4]  Later in her testimony, Andrea explained that after he parked, defendant exited the car and she locked the doors, but he was able to get back in through the driver's side door and then he began hitting her.

6

Andrea, and Andrea spoke to the operator, reporting that defendant had beat her up and hit her with "a nightstand that um, has a hat and coat on it" "and a wooden shoe."[5] However, she did not mention the second altercation in the car. When the sheriff's deputies arrived, Andrea's face was very swollen and bleeding from a laceration at the top of her head. She did not tell the first responders the whole story about what happened that day and did not disclose anything about the altercation in the car because she still wanted to protect defendant.

Andrea rode in an ambulance to the hospital, where she stayed overnight. The parties stipulated to what Andrea's treating physician would have said had the doctor testified. Andrea had an open wound on her left hand, a laceration near her hairline on the right side of her forehead that required one staple, her right eye was swollen shut, and she had a "minimally displaced bilateral nasal bone fracture with associated right facial and orbital soft tissue swelling and bruising." The CAT scans were "negative for intracranial hemorrhage, soft tissue swelling, or fractures. Her blood alcohol content was 0.14 percent. Andrea testified that the head wound required "about four staples," and claimed that she has suffered continued complications such as blurred vision in her right eye and muscle spasms in the right side of her face.

Andrea's trial testimony differed in several respects from her testimony at the preliminary hearing, which had been held approximately three months before the trial. Indeed, Andrea admitted that she lied at the preliminary hearing about certain aspects of the events because she "still was trying to protect [defendant] in some manner." She also said she was under the influence of "Vicodin and narcos and alcohol" during her preliminary hearing testimony. At trial, she testified that defendant grabbed her outside

---

**5** At trial, Andrea explained that the wooden shoe she described to the 911 operator was a plant holder in her living room that defendant hit her with during the first assault earlier that afternoon, but she did not recall the details.

and forced her into the house during the first fight, whereas at the preliminary hearing, she testified that they went voluntarily into the house for privacy. Likewise, at trial, Andrea claimed that she lost consciousness after defendant hit her with the coat rack, but she did not make that claim at the preliminary hearing. Andrea's testimony also differed as to how much and what kind of alcohol she drank after the first assault. During the preliminary hearing, Andrea did not testify that she fainted twice after the second assault in the car.

**The Testimony of Neighbors**

Heather P., who lived across the street from Andrea and defendant but had never spoken to either of them, testified that on September 18, 2011, around 2:30 p.m., she was carrying groceries into her house when she heard a woman screaming "[s]top." She looked out the window and saw a man and a woman arguing on the front porch of Andrea's house. Heather P. testified that the man was standing over the woman, who was sitting in a chair, and hitting her while she was trying to push him away. Heather P. saw the man punch the woman in the chest "a couple [of] times" and then drag her by her shirt into the house, closing the door behind him. She did not see the woman hit the man. Heather P. testified that they were in the house for about two minutes before the man reappeared outside and brought some garage sale items inside. Heather P. called 911 and reported what she had seen.

Later that day, around 7:00 p.m., Ann P. was walking by Andrea's residence on her way to 7-Eleven when she saw Andrea standing in her doorway with her face and head wrapped up with a scarf, so only her eyes were visible. When Ann P. returned from 7-Eleven about 30 minutes later, she did not see Andrea. She went to another neighbor's house, and shortly thereafter, Andrea knocked on the neighbor's door and asked for Ann P. Andrea's face was "messed up badly," bleeding, and "disfigured." Andrea told Ann P., "I can't stand this anymore. Could you please help me?" Ann P. told Andrea she needed an ambulance, and Andrea started walking toward her house but began falling

8

down, so Ann P. helped her into a chair and called 911. While Ann P. was on the phone with the 911 operator, Andrea said she wanted to change out of her bloody shirt, so Ann P. helped her to the bedroom to change. Along the way to the bedroom, Andrea was bumping into walls. After Ann P. helped Andrea into another shirt, Andrea began sliding down the wall in the hallway. Ann P. then led Andrea outside to a chair in front of the house to wait for the police. While they were waiting, Ann P. noticed that Andrea "was kind of talking and then kind of like blanking out and back to talking and then blanking out."

**Law Enforcement Testimony**

On September 18, 2011, at approximately 2:30 p.m., Sacramento County Sheriff's Deputies Cary Trzcinski and Ahmad Formoli were dispatched to the residence in response to Heather P.'s 911 call reporting that a man matching defendant's description was "beating the crap out of" a female. The deputies testified that they arrived around 2:50 p.m. and encountered defendant around the garage, who was wearing a red and white jersey that matched Heather P.'s description. Defendant told them there was no problem and he had just argued with his girlfriend. The deputies asked to speak to her. Defendant then called to Andrea to come talk to the police. The deputies heard Andrea say something like, "[d]on't let them in the house." Within a minute or two of their arrival, the deputies went inside but did not get very far into the house and were inside for only a couple of minutes. Neither deputy noticed blood on the carpet, tile or couch or any signs of a struggle. After they were in the house for about a minute, Andrea appeared in the hallway, about 15 feet from the deputies, wearing a towel around her body and a towel wrapped around her head. She told the deputies that she was fine and that they could leave. She seemed upset that the deputies were inside the house. Neither deputy saw any injuries on Andrea.

At approximately 8:00 p.m., Sacramento County Sheriff's Deputy Lizardo Guzman was dispatched to the residence in response to Ann P.'s 911 call. Deputy

9

Guzman testified that when he arrived, he observed Andrea was bleeding from a two-inch laceration near her hairline, her lips were swollen and bleeding, the inside of her mouth was bleeding, her right eye was swollen shut, and the right side of her face was severely swollen. He also observed that she was dozing off and appeared as if she might faint, but he did not see her lose consciousness.

Andrea informed the deputies that her husband, defendant, had assaulted her with a wooden coat rack inside the house and that caused her to lose consciousness, but she did not mention the second assault in defendant's car. She also told the officers that she felt like she might lose consciousness again. After the deputies spoke to Andrea for about five minutes, paramedics arrived and transported her by ambulance to the hospital. Deputy Guzman searched Andrea's home but did not notice any blood in the home or bloody clothing. The deputies secured the home until a crime scene investigator arrived. The crime scene investigator, Deputy Jeremy Day, testified that he observed blood drops on the tile in the kitchen and dining room area. He also documented a broken coat rack in the living room, which had a broken hook at the base of the rack. He also found another piece from the coat rack near the television in the living room. There was no blood on the coat rack. Additionally, Deputy Day recovered a piece of broken porcelain with blood on it, apparently a handle from a mug or similar object, in the hallway near the bathroom.

While Deputy Day was documenting the crime scene, Deputy Guzman noticed a man matching defendant's description walking on the other side of the street and avoiding eye contact with deputies. Deputy Guzman called defendant's name, and he identified himself. The deputy noticed that defendant had some superficial scratches on his body, which the paramedics treated with Band-Aids. The deputies arrested defendant at the scene.

Later that night, around 9:30 p.m., California Highway Patrol Sergeant Daniel Snook was dispatched to help another officer with defendant's car, which was blocking a

10

driveway on the street where defendant and Andrea resided. Sergeant Snook testified that he observed a substantial amount of fresh blood both on the inside and outside of the car, particularly in the front seating area. There was also some blood on the backseat. The officers found that the car was associated with defendant and contacted the local sheriff's department, who contacted Deputy Guzman. Deputy Guzman was en route to the car when he was called away to respond to another urgent crime scene.

Deputy Guzman testified that because Andrea did not mention anything about an assault in defendant's car, he assumed it was defendant's blood in the car from his scratches, and never examined the car or requested that it be booked into evidence. Several months later, on January 19, 2012, Sacramento County Sheriff's Detective Dennis Prizmich took pictures of the exterior of the car and the interior through the windows. By that time, the towing company had sold the car to another party. However, Detective Prizmich photographed several dark stains inside the car and some red stains on the car's exterior, and Andrea testified that these stains were her blood from the assault in the car.

Karen Van Maren, a victim advocate at the district attorney's office, testified that she contacted Andrea before the preliminary hearing to interview her and go over her police statement with her. Van Maren later accompanied Andrea to the preliminary hearing. When Van Maren went over Andrea's police report with her, Andrea made the statement, "[t]hat's all I could say because I was going to pass out." Andrea also told Van Maren that she had "a couple of staples in [her] head" and a loose tooth as a result of the assaults. Andrea also said that defendant had used "furniture as weapons" but did not specify which furniture he used. She told Van Maren that defendant had beat her up the morning of September 18, 2001, in addition to the other two incidents, and she was amenable to aiding in the prosecution of the defendant, stating, "whatever I need to do to keep him [in jail]." Andrea told Van Maren about the incident in the car and described the blood in the car as "a crime scene." Van Maren also testified that it did not appear to

her that Andrea was under the influence of drugs or alcohol during the preliminary hearing on November 4, 2011.

**The Defense Evidence**

Michele Miller, an investigator for the public defender's office, spoke with Andrea on October 26, 2011.[6]  Miller testified that Andrea told her that she had been hit with a coat rack and a chair.[7]  Andrea told Miller she had been hit approximately 20 times with the coat rack.  Andrea said defendant was jealous that she was talking to several different people during the garage sale.  In addition to the assault with the coat rack, Andrea said defendant hit her when they were outside at the garage sale and she hit him back.  Andrea also told Miller that she had a gash in her head from the first assault with the coat rack but covered it up when the police arrived.  Miller testified that Andrea described the second assault in the car in detail and that defendant reopened the gash in her forehead and she lost consciousness in her doorway later when she returned home.

### Jury Instructions, Closing Arguments, Deliberations and Verdicts

During the instruction conference, the trial court noted that the counts "all have lesser-includeds, arguably."  The court stated, "there's always the requirement that the court give any instruction of any crime that's reasonably related to what the evidence showed."  The court mentioned simple battery and "simple battery on a cohabitant" as possible lesser offenses, and reasoned that "if the jury were to believe the evidence in this

---

[6]  Andrea testified that Miller misled her and did not identify herself as an investigator for the public defender's office or show her county badge or a business card.  Miller testified that she identified herself.

[7]  Andrea testified that she told Miller about other incidents that happened the day before the September 18, 2011 assaults, including an incident when defendant hit her with a chair.  Andrea admitted that she did not clarify to Miller that the chair incident occurred on a different day.  She testified, "I was telling her the day of the incident [and] the day before.  The yard sale Saturday.  I just combined them."  Andrea also explained that she told Miller about things defendant was "doing throughout our relationship."

12

case, I don't see how they could arrive at a lesser. . . . But I may have to give it nonetheless."

The court then asked defense counsel for her opinion. Defense counsel responded that in her view, it would depend on how the prosecutor argued the case and that she wanted to review her notes and think about it. The court replied, "So we'll have you think about that, [counsel]. But I kind of think I have to give them, but we'll see."

The trial court never returned to this issue on the record prior to instructing the jury; nor did the trial court instruct on any lesser included offenses.

After the court gave the instructions but prior to closing arguments, the prosecutor asked the court to clarify the record outside the presence of the jury. The prosecutor stated, "I wanted to get the record clear about the lessers, why they are not being given. It was my understanding that the Court was going to say it didn't find there was a factual basis to give the lessers. [¶] It's also my understanding that the self-defense posture of this case, it's almost like an all or nothing . . . ." The court responded that it "felt that, given the evidence that we heard in this case, they either believe he did this or not. If they believe he did it, then I don't see any basis upon which the jury could find any of the lessers in this case." The court agreed with the prosecutor that it was a case of "all or nothing." The court then asked defense counsel if she wished to address the issue, and counsel responded that she would "err on the side of caution" and ask the court to give the lesser included offense instructions because they might be applicable depending on how the prosecutor argued the case in closing. The court then stated, "Well, yeah, I understand that. Like I said, given the evidence in this case and all the other things, the testimony and photographs and all that, either they believe he did it or not. If they believe he did it, I don't see how they could reach any of those lessers in this case. I find that the evidence is not reasonably conducive or that a jury would render him guilty of any of those lessers."

13

During the prosecutor's closing argument, he told the jury, "Counts One and Two are basically for the same conduct, when [defendant] took the coat rack and hit Andrea with it. Count Three is for the conduct which happened in the car that you heard of later on in the day." In her closing argument, defense counsel relied on the inconsistencies between Andrea's testimony and statements she made to the sheriff's deputies, the victim advocate, the defense investigator, and during her preliminary hearing and trial testimony. Defense counsel also contended that the evidence was more consistent with defendant acting in self-defense.

Several hours into deliberations, the jury submitted a question to the court, asking whether "Count I includes events that occurred outside on the porch." The court consulted with counsel and responded to the jury, "That is for you to decide. Please refer to Instruction 3500," the unanimity instruction. The jury returned its verdict less than an hour later, finding defendant guilty of counts one and three, corporal injury on a cohabitant, but not guilty of count two, assault with a deadly weapon. The jury also found the great bodily injury allegation true as to count three but not true as to count one.

After the jury rendered its verdict, the parties made a record about the court's response to the jury's question. The court noted that defense counsel objected to the court's proposed response to the jury about whether count one included events outside on the porch. Defense counsel also objected to the reference to the unanimity instruction and leaving to the jury to decide whether the conduct on the porch constituted the crime charged in count one. Defense counsel explained that the People argued "Count One and Count Two were the same incident. So the fact that we have guilty and not guilty on Count One and Count Two means that the jury considered what was outside [the house] as a 273.5 and not what happened inside. [¶] And the problem with that being is if [the prosecutor] had argued that, elected what occurred outside, then I would have asked for a lesser. Because what we heard as evidence happened outside was pushing and potentially

14

punching, which would have been something that should have been available as a [lesser under] 243(e)(1)."

The prosecutor contended it was appropriate for the court to respond to the jury's question that it was up to them to decide whether count one included the events outside on the porch. He conceded he had argued that counts one and two were for the alleged coat rack assault, but noted, "it wouldn't be the first time that the jury went with a different scenario than I thought that I argued." In the prosecutor's view, the verdict meant that the jury "unanimously agreed, and the instruction's pretty clear, that it must pose a traumatic condition. So they believed it was a traumatic condition resulted from the event." Defense counsel again contended that the difference in the verdicts on counts one and two indicated that the jury was "considering something that happened outside, which is not the way the DA elected to argue the case. And, therefore, there should have been a lesser included for that purpose. They clearly didn't believe she was hit with the coat rack." The court concluded that it still believed its response to the jury's question was appropriate.

**Postconviction Motion and Sentencing**

On April 11, 2012, defendant filed a motion to strike his prior conviction under *People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497, and to reduce the count one conviction to a misdemeanor pursuant to section 17, subdivision (b), arguing that the jury's question and inconsistent verdicts illustrated that the count one conviction was a "wobbler." On April 13, 2012, the court held a hearing on defendant's motion and initially conceded that "the jury verdict was a little unusual in some ways, I will be the first to admit that." Defense counsel argued that "everybody was in agreement that Count One, the 273.5, and Count Two, the 245(a)(1), were the same occurrence, the same instance that would have been sentenced concurrently. So, therefore, the fact the jury found not guilty, not true that he struck her with a coat hanger [*sic*] [¶] . . . [¶] . . . on Count Two would also lead to believe that under the People's argument that it should

15

also have been a not guilty as to Count One for the same assault with a coat rack. [¶] So the issue, then, becomes did they convict on the 273.5 for something else, which should have had a lesser read to them regarding potentially a pushing or something that the neighbor saw." Defense counsel maintained that the evidence supported a verdict on the lesser included offense of misdemeanor cohabitant battery (§ 243, subd. (e)(1)), and requested the court to reduce count one to a misdemeanor pursuant to section 17, subdivision (b).

The People responded, "The jury could have thought, you know what, the coat rack isn't a deadly weapon and I don't think that there was a serious bodily injury, but she was hurt. . . . They thought maybe the pushing outside was a 273.5. [¶] Whatever it is, the jury found that there was an incident in which Mr. Wiley, the defendant, assaulted [Andrea] and caused her traumatic injury. That's all you need for a 273.5. [¶] And I think to 17(b) it or to say maybe they thought this or maybe they thought that would be trying to read what happened in that deliberation room." The trial court agreed with the People, reasoning "So maybe they didn't agree on the coat rack, but they may have agreed on some other conduct. We have to assume they followed my instruction in that regard. [¶] And I think that in context, what happened that day was pretty serious, obviously. I'm not prepared to 17(b) on that as argued here by [defense counsel]." Accordingly, the court denied defendant's motion to reduce count one to a misdemeanor.

Defendant admitted one prior serious felony conviction, and the People dismissed the allegation of the second serious felony conviction. The court also denied defendant's *Romero* motion.

The court sentenced defendant to an aggregate term of 15 years in state prison calculated as follows: for count three, the midterm of three years doubled because of the strike conviction, plus four years for the great bodily injury enhancement, for a total of 10 years; for count one, a concurrent sentence of four years, the low term doubled; and a consecutive five years for defendant's prior serious felony conviction.

16

## DISCUSSION

### A.  Instructional Error

Defendant contends that the trial court erred in failing to instruct the jury on the lesser included offense of misdemeanor cohabitant battery as to count one.  Specifically, defendant argues that "there was substantial evidence that [defendant] assaulted [Andrea] but did not cause traumatic injury, and because the objective record of deliberations shows that the jury was relying on this evidence when it returned its verdict, this instructional error requires reversal of count one."  The People concede that misdemeanor cohabitant battery is a lesser included offense of inflicting corporal injury on a spouse but maintain the court had no duty to instruct on it.  The People contend that "[t]he only reasonable conclusion the jury could reach was that Andrea sustained the laceration in the initial assault" and accordingly, defendant was "either guilty of violating section 273.5 in count [one] or not."  We disagree that the only reasonable conclusion is that Andrea sustained the laceration during the first incident and with the People's theory that the evidence presented an "all or nothing" situation.

We review de novo whether the trial court erred in failing to instruct on a lesser included offense.  (*People v. Cook* (2006) 39 Cal.4th 566, 596.)  The trial court was apparently under the impression it had to give a lesser offense if it was "reasonably related to what the evidence showed,"[8] and it found that "the evidence is not reasonably conducive or that a jury would render [defendant] guilty of those lessers."

Instruction on a lesser included offense is required when there is substantial evidence of the lesser offense.  Substantial evidence in this context means evidence from which a jury could reasonably conclude that the lesser offense, but not the greater

---

[8]  This seems like a reference to the former requirement that trial courts instruct on lesser *related* offenses, which our high court rejected in *People v. Birks* (1998) 19 Cal.4th 108, 112-113.

offense, was committed. (*People v. Breverman* (1998) 19 Cal.4th 142, 162 (*Breverman*).) Stated slightly differently, a defendant is entitled to an instruction on a lesser included offense if " 'there is evidence which, if accepted by the trier of fact, would absolve [the] defendant from guilt of the greater offense' [citation] *but not the lesser.* [Citations.]" (*People v. Memro* (1995) 11 Cal.4th 786, 871 (*Memro*).) "In deciding whether evidence is 'substantial' in this context, a court determines only its bare legal sufficiency, not its weight." (*Breverman*, *supra*, at p. 177.)

The People have no "legitimate interest in obtaining a conviction of the offense charged where the jury entertains a reasonable doubt of guilt of the charged offense but returns a verdict of guilty of that offense solely because the jury is unwilling to acquit where it is satisfied that the defendant has been guilty of wrongful conduct constituting a necessarily included offense. Likewise, a defendant has no legitimate interest in compelling the jury to adopt an all or nothing approach to the issue of guilt. Our courts are not gambling halls but forums for the discovery of truth." (*People v. St. Martin* (1970) 1 Cal.3d 524, 533.)

Misdemeanor cohabitant battery is a lesser included offense of inflicting corporal injury on a spouse or cohabitant. (See *Peoplev. Hamlin* (2009) 170 Cal.App.4th 1412, 1457; accord, *People v. Jackson* (2000) 77 Cal.App.4th 574, 580.) The difference between inflicting corporal injury on a cohabitant and misdemeanor cohabitant battery is whether the battery resulted in "a traumatic condition." (See §§ 243, subd. (e)(1), 273.5, subd. (a).) If it did, then the crime is inflicting corporal injury on a cohabitant, a potential felony. (§ 273.5, subd. (a).) If it did not, the crime is cohabitant battery, a misdemeanor. (§ 243, subd. (e)(1).) "Traumatic condition," is defined as "a condition of the body, such as a wound or external or internal injury, whether of a minor of serious nature, caused by

18

a physical force." (§ 273.5, subd. (c); see Stats. 2007, ch. 582, § 1;[9] see also *People v. Wilkins* (1993) 14 Cal.App.4th 761, 771.) A "traumatic condition" for purposes of section 273.5 includes even a "minor" injury. (*Wilkins, supra,* at p. 771.)

In this case, there was substantial evidence from which a reasonable jury could have convicted defendant of misdemeanor cohabitant battery based on what he did outside on the porch, instead of the charged offense, had the court instructed on this lesser included offense. (Cf. *Breverman*, *supra*, 19 Cal.4th at p. 162.) The medical evidence, to which the parties stipulated, shows that Andrea did suffer a traumatic condition in that, by the time she arrived at the hospital, she had an open wound on her left hand, a laceration near her hairline on the right side of her forehead that required a staple, her right eye was swollen shut, and she had a "minimally displaced bilateral nasal bone fracture with associated right facial and orbital soft tissue swelling and bruising." However, there was no evidence about how such wounds could or could not have been inflicted, and the jury was left to draw inferences from the conflicting evidence about which assault caused Andrea's injuries.

Andrea testified blood "flew out" of her head after the first blow with the coat rack, which occurred inside of the house. She testified that after she regained consciousness following the assault with the coat rack, she saw blood inside "everywhere" on the floor near her head, the couch, the coat rack, and her clothes. However, Deputies Trzcinski and Formoli testified that they responded to Heather P.'s 911 call regarding the first assault within approximately 20 minutes, and they did not see any blood in the house or on defendant and there were no signs of a struggle. The deputies also testified that Andrea did not appear injured or bleeding. In fact, when the deputies asked whether she was injured, she told them that she was fine and that they

---

**9** The definition of "traumatic condition" can now be found in section 273.5, subdivision (d).

19

could leave.  Additionally, later that night, when Deputy Guzman searched Andrea's home following the assault in the car, he did not observe any blood in the home or bloody clothing.  He testified that when he searched the bathroom and hallway, there was no blood anywhere in that area.

As for what occurred outside prior to the alleged assault inside the house with the coat rack, Andrea did not testify that she sustained any injuries when she was attacked by defendant outside on the porch.  Nor did she say she had the sensation of being injured at that time.  And Heather P., the neighbor who witnessed this part of the first incident, did not say she saw any injuries inflicted at that time either.

Given the lack of blood, lack of apparent injuries when the deputies responded to the first 911 call and Andrea's statements to those deputies, the jury also could have reasonably inferred that defendant had not inflicted traumatic injury on Andrea prior to the sheriff's response to the first 911 call, outside or inside of the house.

The People argue that the fact that the deputies "did not see any visible injuries on Andrea after the first assault was not conclusive evidence that she was uninjured" because they observed her from 15 feet away and she may have concealed her injuries. While the People offer one reasonable interpretation of the evidence they contend is reasonable, this argument dodges the appropriate test.  The test is not whether there is "conclusive evidence" to support an instruction on a lesser included offense but whether there is evidence from which a jury could reasonably conclude that the lesser offense, but not the greater offense, was committed.  (*Breverman*, *supra*, 19 Cal.4th at p. 162.) Although the deputies' observations were not "conclusive evidence," together with the lack of blood, lack of apparent injuries, Heather P.'s testimony and Andrea's inconsistent stories, there was substantial evidence from which a reasonable jury could conclude that Andrea was not injured during the first incident and defendant is guilty of the lesser offense, but not the charged offense.  Accordingly, there is substantial evidence "rais[ing] a question as to whether all of the elements of the charged offense are present and there is

20

evidence that would justify a conviction" on misdemeanor cohabitant battery, which does not require a traumatic condition. (*People v. Ramkeesoon* (1985) 39 Cal.3d 346, 351.)

Our analysis is buttressed by the jury's question whether count one included "events that occurred outside on the porch," the jury's finding that the GBI allegation on count one was not true and the acquittal on count two, assault with a deadly weapon. In response to defendant's section 17, subdivision (b) request, the prosecutor contended that "[t]he jury could have thought . . . the coat rack isn't a deadly weapon and I don't think that there was a serious bodily injury, but she was hurt." While that is certainly possible, since the prosecutor argued to the jury that counts one and two related to the same conduct with the coat rack, the trial court correctly observed that it was "unusual" that the jury would convict on count one, without the GBI allegation, and acquit on count two. Indeed, as defense counsel aptly pointed out during the hearing on defendant's section 17, subdivision (b) request, the inconsistent verdicts could also be indicative that the jury convicted defendant for "something else, which should have had a lesser read to them regarding potentially a pushing or something that the neighbor saw." We agree that the jury did not believe Andrea's testimony about what happened inside of the home beyond a reasonable doubt and that it is more likely the jury based its conviction on count one on Heather P.'s observations of what happened on the porch. After hearing the evidence, the jury could reasonably have rejected Andrea's testimony about the coat rack but believed that defendant hit her outside on the porch and dragged her into the house without causing a traumatic condition. In other words, if properly instructed on the lesser included offense, the jury could have " 'absolve[d] [the] defendant from guilt of the greater offense' [citation] *but not the lesser.*" (*Memro*, *supra*, 11 Cal.4th at p. 871.)

Accordingly, we conclude that there was substantial evidence from which a reasonable jury could find that defendant was guilty of misdemeanor cohabitant battery but not inflicting corporal injury on a cohabitant. The trial court erred in failing to instruct on this lesser included offense.

21

## B. Prejudice

Reversal is not warranted unless an examination of the entire cause, including the evidence, demonstrates that the error caused a miscarriage of justice. This test is met if it "appears 'reasonably probable' the defendant would have achieved a more favorable result had the error not occurred." (*Breverman*, *supra*, 19 Cal.4th at p. 149, citing *People v. Watson* (1956) 46 Cal.2d 818, 836.) Probability under the *Watson* test "does not mean more likely than not, but merely a reasonable chance, more than an abstract possibility." (*People v. Superior Court* (*Ghilotti*) (2002) 27 Cal.4th 888, 918 (*Ghilotti*).)

The People contend that if the trial court erred, the error does not require reversal because the error did not produce a "miscarriage of justice." Conversely, defendant contends that "because the jury was never given the opportunity [to] decide this exact issue, and instead, were [*sic*] placed in the untenable position of choosing between a guilty verdict on count one or outright acquittal, the trial court's failure to instruct on the lesser included offense of misdemeanor cohabitant battery cannot be deemed harmless." We agree with defendant. In assessing prejudice, it does not matter that the jury chose to convict defendant of the greater offense over acquittal or that the defendant was convicted of the greater offense on sufficient evidence. (*Breverman*, *supra*, 19 Cal.4th at p. 178, fn. 25.)

Here, the evidence supporting the guilty verdict of inflicting corporal injury on a cohabitant does not compel the conclusion that the jury could not reasonably have reached a guilty verdict of misdemeanor cohabitant battery. There are several indicators that demonstrate it is reasonably probable defendant would have obtained a more favorable outcome were it not for the instructional error. There was no evidence Andrea received any injuries on the porch, and Andrea's testimony about what happened inside of the house was contradicted by circumstances we have described. And as evidenced by the jury's verdict on count two and the great bodily injury finding on count one, Andrea's testimony did not convince the jury beyond a reasonable doubt. Accordingly, we

22

conclude it was reasonably probable defendant "would have obtained a more favorable outcome" had the jury been instructed on misdemeanor cohabitant battery. (*Breverman*, *supra*, 19 Cal.4th at p. 178; see *Ghilotti*, *supra*, 27 Cal.4th at p. 918.) The error was therefore prejudicial and we must reverse defendant's felony conviction of inflicting corporal injury on a spouse in violation of section 273.5, subdivision (a).

"When a greater offense must be reversed, but a lesser included offense could be affirmed," the People have the "option of retrying the greater offense, or accepting a reduction to the lesser offense." (*People v. Kelly* (1992) 1 Cal.4th 495, 528.) Accordingly, the prosecutor has the option of retrying defendant or accepting a reduction of the conviction to misdemeanor cohabitant battery under section 243, subdivision (e)(1).

## DISPOSITION

Defendant's conviction on count one, inflicting corporal injury on a spouse in violation of section 273.5, subdivision (a), is reversed. If, after the filing of the remittitur in the trial court, the People do not retry defendant on count one within the time limit set forth in section 1382, subdivision (a)(2)--60 days unless waived by defendant--the trial court shall treat the remittitur as a modification of the judgment as to count one to reflect, rather, a conviction of misdemeanor cohabitant battery (§ 243, subd. (e)(1)), and resentence defendant accordingly. *(People v. Woods* (1992) 8 Cal.App.4th 1570, 1596.) In all other respects, the judgment is affirmed.

                                           _____MURRAY_____, J.

We concur:


_____BLEASE_____, Acting P. J.


_____HOCH_____, J.

23